UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------- X

WILLIAM G. CUMMINGS and JAY G.
LEVINE,

              Plaintiffs,

         - against -

ADIDAS USA, et al.,

            Defendants.

-------------------------------------------------------- X

**OPINION AND ORDER**

**08 Civ. 9860 (SAS)**



USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED 5/24/10

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

## I. INTRODUCTION

Plaintiffs William Cummings and Jay Levine allege that defendants Nike, Inc. ("Nike") and Converse Inc. ("Converse") infringe United States Patent No. RE40,215 ("the '215 Patent"). Nike and Converse (collectively, "defendants") seek partial summary judgment that claims 5 and 6 of the '215 Patent are invalid. In short, the invention described in claims 5 and 6 of the '215 Patent is a "lateral foot stabilizer" — essentially a small outgrowth on the side of a shoe that widens the sole in order to provide greater foot and ankle stability for athletes. Because Nike's Air Jordan XV athletic shoe ("AJXV") anticipates the invention asserted in claims 5 and 6 of the '215 Patent and predates plaintiffs' original patent application

by more than one year, claims 5 and 6 are invalid under the statutory "on-sale bar"

codified at section 102(b) of title 35 of the United States Code.  Accordingly,

defendants' motion is granted.

## II.    BACKGROUND

### A.    The Patent-In-Suit

Plaintiffs filed their original patent application on July 17, 2000.[1]  The

application matured into United States Patent No. 6,474,006 ("the '006 Patent").[2]

The '006 Patent contained four claims — independent claim 1 and dependent

claims 2-4.[3]  Plaintiffs then filed another patent application to obtain a reissue of

the '006 Patent with broader coverage.[4]  That application matured into the '215

Patent — the patent-in-suit.[5]  The '215 Patent contains claims 1-4 of the original

---

[1]    *See* Defendants' Local Rule 56.1 Statement of Undisputed Facts ("Def. 56.1") ¶ 1; Plaintiffs' Response to Defendants' Local Rule 56.1 Statement of Undisputed Facts ("Pl. 56.1 Response") ¶ 1; Plaintiffs' Revised Local Rule 56.1 Counter-Statement of Undisputed Facts ("Pl. 56.1 Counter") ¶ 25.

[2]    *See* Def. 56.1 ¶ 2; Pl. 56.1 Response ¶ 2; Pl. 56.1 Counter ¶ 25; '006 Patent, Ex. A to Revised Affidavit of William Cummings, M.D. in Opposition to Defendants' Motion for Partial Summary Judgment ("Cummings Aff.").

[3]    *See* Def. 56.1 ¶ 2; Pl. 56.1 Response ¶ 2; '006 Patent at 6.

[4]    *See* Def. 56.1 ¶¶ 8, 10; Pl. 56.1 Response ¶¶ 8, 10; Pl. 56.1 Counter ¶ 26.

[5]    *See* Def. 56.1 ¶ 9; Pl. 56.1 Response ¶ 9; Pl. 56.1 Counter ¶ 26; '215 Patent, Ex. A to Cummings Aff.

2

'006 Patent, plus new independent claim 5 and new dependent claims 6-10.[6]

The '215 Patent is for "Stabilizer Athletic Shoes".[7]  According to the

"Background of the Invention" section of the patent:

> Current athletic shoes do not adequately guard against
> injuries caused by all type of athletic activities, including
> those activities which involve side-to-side jumping
> motions.  These activities have greater tendency for lateral
> foot ankle instability, and hence injury in the foot and/or
> ankle.[8]

The '215 Patent summarizes the invention as follows:

> In accordance with the present invention an athletic
> shoe is provided which, because of its unique construction,
> assures dynamic foot stability, reduces lateral ankle
> instability and alleviate foot fatigue which often results
> from athletic activities such as jogging, running, tennis,
> basketball, jumping and even weight lifting exercises.  In
> one embodiment, the athletic shoe comprises heel and a
> sole having a rear foot portion and a forefoot portion which
> has a medial section and a lateral section.  The forefoot
> portion has a lateral wedge conformally affixed thereto or
> formed, integrally therewith, said lateral wedge member
> being tapered from the medial section toward the lateral
> mid portion of the forefoot.
>
> In a second embodiment, the shoe is similar to the
> first embodiment and further includes a lateral heel
> stabilizer conformally attached to the heel counter, a medial
> heel wedge spanning the length and width of the shoe heel,

---

[6]     *See* Def. 56.1 ¶ 10; Pl. 56.1 Response ¶ 10; '215 Patent at 6.

[7]     '215 Patent at 1.

[8]     *Id.* at 5.

and a tapered lateral forefoot member attached to the bottom sole of the shoe.[9]

## B. Plaintiffs Accuse Nike's AJXV Shoe of Literally Infringing Claims 5 and 6 of the '215 Patent

The Complaint alleges that many of defendants' products infringe the

'215 Patent, including the AJXV.[10]  In response to defendants' Requests for

Admission, plaintiffs admitted that they accuse the AJXV of literally infringing

claims 5 and 6 of the '215 Patent.[11]  Claim 5 of the '215 Patent states:

> A stabilizer athletic shoe comprising a sole having a bottom portion, a forefoot having a top portion, a rear foot portion, an edge and a heel portion, said forefoot portion having a medial part and a lateral part, and a *lateral foot stabilizer* integral with and conformally contouring the edge of said sole.[12]

Claim 6 states:

> A stabilizer athletic shoe as in claim 5 wherein said *lateral*

---

[9]      *Id.*

[10]      *See* Def. 56.1 ¶ 11; Pl. 56.1 Response ¶ 11; First Amended Complaint ¶ 21.  After this motion was briefed, plaintiffs filed with defendants' consent a Second Amended Complaint ("SAC"), which also alleges that the AJXV categorically infringes the '215 Patent. *See* SAC ¶ 11.

[11]      *See* Def. 56.1 ¶ 12; Pl. 56.1 Response ¶ 12; Excerpt from Plaintiffs' Answers to Defendant Nike, Inc.'s First Set of Requests for Admission at 5, Ex. B to Defendants' Memorandum of Law in Support of Motion for Partial Summary Judgment ("Def. Mem.").

[12]      '215 Patent at 6 (emphasis added).

> *foot stabilizer* is from about 1/8 to about 1/4 inch thick,
> with the thickness increasing from said medial part to said
> lateral part of said forefoot portion.[13]

The lateral foot stabilizer is identified as number 21 in the following figures

incorporated into the '215 Patent.[14]



---

[13]     *Id.* (emphasis added)

[14]     *See id.* at 5-6 ("For the purposes of this invention, in the embodiment
shown in FIGS. **1-3**, the shoe is provided with an external lateral forefoot stabilizer
**21** which is formed as an integral part of the shoe conformally contouring the
lateral forefoot portion of the shoe. The lateral forefoot stabilizer **21** is preferably
about 1/8 to about 1/4 inch thick and is attached to the edge of the sole, with its
thickness increasing gradually toward the lateral side where it is at its greatest
thickness. The lateral forefoot stabilizer **21** extends a distance of from about 2 to
about 4 inches, from the middle toward the toe portion **15**, thus extending from the
*5th* toe proximal to the *5th* metatarsal base. The lateral forefoot stabilizer **21** may
be made of the same material forming the shoes, generally hard rubber, neoprone

According to plaintiffs, when the lateral foot stabilizer is added to a shoe, it slightly widens the base of an athlete's gait. As a result, the stabilizer improves the athlete's ability to balance on the surface below and adjust to surface gradients, and reduces excess supination or inversion of the foot and ankle.[15]

## C.     Development and Production of the AJXV

In 1998 and early 1999, Nike designed, developed, and began marketing the AJXV as part of its Holiday 1999 line.[16] Gentry Humphrey, who was involved in designing the AJXV, testified at his deposition that the AJXV design, *since its inception* in about May 1998, included a feature referred to as an "outrigger".[17] According to Humphrey, an outrigger "is basically a portion of the

---

or a plastic, such as a copolymer of ethylene and vinyl acetate (EVA). The provision of the lateral forefoot wedge **21** will accomplish two goals, i.e., locking the metatarsal joint at propulsive phase of gait thus producing a stronger lever arm which results in increased push-off power. In addition, it decreases lateral ankle instability in the types of sport activities which require excessive medial to lateral movements.").

[15]     *See* Cummings Aff. ¶¶ 8-11; Revised Affidavit of Jay G. Levine, D.P.M. in Opposition to Defendants' Motion for Partial Summary Judgment ¶¶ 12-20.

[16]     *See* Declaration of Gentry Humphrey, International General Manager for Brand Jordan at Nike, in Support of Defendants' Motion for Partial Summary Judgment ("Humphrey Decl.") ¶¶ 6, 7, 11.

[17]     *See* Deposition of Gentry Humphrey ("Humphrey Dep.") at 19, Ex. C to Def. Mem.

shoe that's placed near the forefoot and used for lateral support on the [out]sole and midsole."[18]  While the design of the AJXV changed over time, every iteration of the shoe contained an outrigger.[19]

By at least December 1998, Nike ordered a first round sample of the AJXV from an independently-owned manufacturer, Pou Chen Corporation ("Pou Chen") in Taiwan.[20]  On April 18, 1999, a Nike employee hand carried AJXV samples from the Pou Chen factory to Nike headquarters in Oregon.[21]  The following are images of one prototype:

 

---

[18]     *Id.* at 15-16.  The outsole is "[t]he bottom of the shoe." *Id.* at 18.  The midsole is the area between the outsole and the "top of the shoe." *Id.* at 18-19.

[19]     *See id.* at 57-58.

[20]     *See* Declaration of Jim Grove, Footwear Development Director for Nike, in Support of Defendants' Motion for Partial Summary Judgment ("Grove Decl.") ¶ 8.

[21]     *See id.* ¶ 10 & Ex. B (photographs).

On April 21, 1999, the Pou Chen factory sent Nike quotes for a production of 650,000 pairs of the AJXV.[22] The design was finalized in May 1999, and mass production was scheduled to commence in the following August.[23]

In early March 1999, Nike held its United States sales meeting, during which it prepared and educated its sales force to sell the AJXV.[24] After that sales meeting, Nike sales people began offering the AJXV to buyers, including through Nike's Holiday 1999 Jordan Footwear catalog.[25] Three thousand five hundred copies of this catalog were delivered to Nike on March 30, 1999.[26] Nike's sales representatives presented these catalogs to retailers in the following April, May, and June.[27] By April 27, 1999, buyers had placed "futures orders" for thousands of pairs of the AJXV.[28] By June 28, 1999, retailers had ordered more than 600,000

---

[22]     *See id.* ¶ 14

[23]     *See id.* ¶¶ 16-19 & Ex. C (May 20, 1999 Tooling RFC Memo Email Thread).

[24]     *See* Humphrey Decl. ¶¶ 15-18.

[25]     *See id.* ¶¶ 6, 19 & Ex. E (Nike's Holiday 1999 Jordan Footwear Catalog).

[26]     *See* Grove Decl. ¶ 9.

[27]     *See* Humphrey Dep. at 79-82.

[28]     *See* Humphrey Decl. ¶¶ 20-21 & Ex. D (HO99 Season-to-Date Futures Dated Apr. 27, 1999 (stating 47,800 orders for Men's AJXV, style number 136029; and 15,000 for Boys' AJXV, style number 135336)).  Humphrey

pairs of the AJXV.[29]

In June 1999, Nike, Inc. sold eighteen pairs of sample AJXV shoes to
several Nike USA, Inc. sales representatives and showrooms.[30] For example, Nike
sold a pair of the shoes to Nike Brand Jordan sales representative Peter Orcutt.[31]
Under the terms of Nike's Sale Sample Policy and Orcutt's Employment
Agreement, he was obligated to purchase the AJXV sample with funds from his
Sales Sample Account.[32]

From June 22, 1999, through July 2, 1999, Nike issued firm purchase

---

explained that the "Futures Program allows a retailer to place an order on a specific
product and then six months later receive that product for sales to their customers."
Humphrey Dep. at 51.

[29]    *See* Humphrey Decl. ¶ 23 & Ex. D (HO99 Season-to-Date Futures
Dated June 28, 1999 (stating 214,800 orders for Men's AJXV, style number
136029; 230,100 for Boys' AJXV, style numbers 135336 and 134090; and 165,000
for Infants' AJXV, style numbers 832003 and 832004)).

[30]    *See* Declaration of Forbes Campbell, IT Senior Business Systems
Analyst for Nike, in Support of Defendants' Motion for Partial Summary Judgment
("Campbell Decl.") ¶¶ 4-6, 8 & Ex. A at Rows 4857-4874 (Excerpt of Profitability
Report for AJXV).

[31]    *See id.*; Declaration of Peter Orcutt, North American Sales Manager
for Nike Basketball, in Support of Defendants' Motion for Partial Summary
Judgment ("Orcutt Decl.") ¶¶ 3, 5.

[32]    *See* Orcutt Decl. ¶¶ 4-7 & Ex. A(a) ¶¶ 3.4.4, 5.3 (Employment
Agreement), Ex. A(b) ¶¶ 1-3 (Nike Sales Sample Policy).

orders to factories in Asia for at least 86,337 pairs of AJXV shoes.[33]  Under the terms of pre-existing supply contracts between the factories and Nike, Nike's placement of firm orders for the AJXV obligated the factories to manufacture the shoes and sell them to Nike, and Nike was obligated to purchase them.[34]

Mass production of the AJXV commenced on August 10, 1999 — more than forty days after the firm orders were made, as per the lead time required by the supply contracts between Nike and the factories.[35]  Nike is still in possession of one of the AJXV shoes actually produced in the initial mass production run.[36] The following are images of this shoe:



---

[33]     *See* Declaration of Tanya Dix Haas, Senior Global Planning Analyst for Nike ("Dix Haas Decl.") ¶¶ 9-10, 19 & Ex. A at Row 14 (Holiday 1999 AJXV Purchase Order Spreadsheet), Ex. B at Col. H, Lines 7-8 (All AJXV Purchase Orders Spreadsheet), Ex. C (exemplary purchase orders).

[34]     *See* Grove Decl. ¶ 6 & Ex. A(a) ¶¶ 2, 7 (Supply Agreement between Nike and Yue Yuen Industrial Holdings Ltd), Ex. A(b) ¶¶ 2, 7 (Supply Agreement between Nike and Pou Chen Corporation).

[35]     *See* Grove Decl. ¶ 6 & Ex. A(a) ¶ 7, Ex. A(b) ¶ 7.

[36]     *See* Grove Decl. ¶ 20 & Ex. B (photographs).

## III.   STANDARD FOR SUMMARY JUDGMENT

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."[37]  "'An issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  A fact is material if it might affect the outcome of the suit under the governing law.'"[38]  "[T]he burden of demonstrating that no material fact exists lies with the moving party . . . ."[39]  "When the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the non[-]movant's claim."[40]

To defeat a motion for summary judgment, the non-moving party must raise a genuine issue of material fact.[41]  The non-moving party must do more

---

[37]   Fed. R. Civ. P. 56(c).

[38]   *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009) (quoting *Roe v. City of Waterbury*, 542 F.3d 31, 34 (2d Cir. 2008)).

[39]   *Miner v. Clinton County, N.Y.*, 541 F.3d 464, 471 (2d Cir. 2008) (citing *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 202 (2d Cir. 2007)).

[40]   *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008).

[41]   *See id.*

11

than show that there is "'some metaphysical doubt as to the material facts,'"[42] and it "'may not rely on conclusory allegations or unsubstantiated speculation.'"[43] However, "'all that is required [from a non-moving party] is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial.'"[44]

In determining whether a genuine issue of material fact exists, the court must "constru[e] the evidence in the light most favorable to the non-moving party and draw all reasonable inferences" in that party's favor.[45]  However, "'only admissible evidence need be considered by the trial court in ruling on a motion for summary judgment.'"[46]  "'Credibility assessments, choices between conflicting versions of the events, and the weighing of evidence are matters for the jury, not

---

[42]    *Higazy v. Templeton*, 505 F.3d 161, 169 (2d Cir. 2007) (quoting *Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

[43]    *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005) (quoting *Fujitsu Ltd. v. Federal Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001)).

[44]    *Kessler v. Westchester County Dep't of Soc. Servs.*, 461 F.3d 199, 206 (2d Cir. 2006) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986)).

[45]    *Sledge v. Kooi*, 564 F.3d 105, 108 (2d Cir. 2009) (citing *Anderson*, 477 U.S. at 247-50, 255).

[46]    *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 582 F.3d 244, 264 (2d Cir. 2009) (quoting *Raskin v. Wyatt Co.*, 125 F.3d 55, 65 (2d Cir. 1997)).

for the court on a motion for summary judgment.'"[47]   Summary judgment is

therefore "appropriate only if there is no genuine issue of material fact and the

moving party is entitled to judgment as a matter of law."[48]

## IV.   DISCUSSION

### A.   The Statutory On-Sale Bar

Defendants contend that claims 5 and 6 of the '215 Patent are invalid

under the statutory on-sale bar, which provides that a patent is not valid if "the

invention was . . . on sale in this country, more than one year prior to the date of

the application for patent in the United States."[49]   An accused infringer, therefore,

may overcome a patent's presumption of validity[50] by presenting "'clear and

convincing evidence that there was a definite sale or offer to sell more than one

---

[47]      *McClellan v. Smith*, 439 F.3d 137, 144 (2d Cir. 2006) (quoting *Fischl v. Armitage*, 128 F.3d 50, 55 (2d Cir. 1997)).

[48]      *Pyke v. Cuomo*, 567 F.3d 74, 76 (2d Cir. 2009).

[49]      35 U.S.C. § 102(b).  Defendants additionally contend that claims 5 and 6 of the '215 Patent are invalid under (1) sections 102(a) and (b) of title 35 because the invention claimed therein was described in a printed publication more than a year before July 17, 2000, and also was publicly known in the United States; and (2) section 102(g) of title 35 because Nike invented the AJXV shoe before plaintiffs invented the claimed invention.  *See* Def. Mem. at 19-23.  Because I conclude that the on-sale bar applies to invalidate claims 5 and 6 of the '215 Patent, I do not reach defendants' other arguments.

[50]      *See* 35 U.S.C. § 282.

13

year before the application for the subject patent, and that the subject matter of the

sale or offer to sell fully anticipated the claimed invention,' or rendered it

obvious."[51]  The date one year prior to the filing of the patent application is called

the "critical date."[52]

        In *Pfaff v. Wells Electronics, Inc.*, the Supreme Court explained that

"the on-sale bar applies when two conditions are satisfied before the critical

date."[53]  *First*, "the product must be the subject of a commercial offer for sale."[54]

*Second*, "the invention must be ready for patenting."[55]

        "Although the ultimate determination of whether a patent is invalid

under 35 U.S.C. § 102's on-sale bar is a question of law, this determination is

based upon underlying factual considerations."[56]

---

[51]    *Elan Corp., PLC v. Andrx Pharm., Inc.*, 366 F.3d 1336, 1340 (Fed. Cir. 2004) (quoting *Group One, Ltd. v. Hallmark Cards, Inc.*, 254 F.3d 1041, 1045-46 (Fed. Cir. 2001)) (citation omitted).  *Accord Honeywell Int'l. Inc. v. Universal Avionics Sys. Corp.*, 488 F.3d 982, 996 (Fed. Cir. 2007).

[52]    *See Sparton Corp. v. United States*, 399 F.3d 1321, 1321 (Fed. Cir. 2005).

[53]    525 U.S. 55, 67 (1998).

[54]    *Id.*

[55]    *Id.*

[56]    *Sparton Corp.*, 399 F.3d at 1323.

14

**B.    The AJXV Anticipates Claims 5 and 6 of the '215 Patent**

In a typical case concerning the on-sale bar, "'the *patentee* has placed some device on sale prior to the critical date and the *accused infringer* must demonstrate that this device actually embodied or rendered obvious the patented invention.'"[57] Less common is the scenario where, as here, the patentee accuses a product that was subject to an offer of commercial sale before the critical date.[58]

The Federal Circuit confronted such circumstances in *Vanmoor v. Wal-Mart Stores, Inc.* The plaintiff, Vanmoor, held a patent for a specially-designed cartridge used to dispense caulking compound, and he accused various retailers and manufacturers of infringing the patent.[59] In granting summary judgment to the defendants and invalidating the patent, the district court concluded that Vanmoor had not raised a genuine issue of material fact that the accused products were not on sale prior to the critical date and that the defendants had shown by clear and convincing evidence that the accused products were for sale

---

[57]    *Vanmoor v. Wal-Mart Stores, Inc.*, 201 F.3d 1363, 1366 (Fed. Cir. 2000) (quoting *Evans Cooling Sys. Inc. v. General Motors Corp.*, 125 F.3d 1448, 1451 (Fed. Cir. 1997)) (emphasis added).

[58]    *See id.*; *Evans Cooling Sys. Inc.*, 125 F.3d at 1451.

[59]    *See Vanmoor*, 201 F.3d at 1364-65.

and in public use prior to the critical date.[60]

Affirming the grant of summary judgment to the defendants, the Federal Circuit rejected Vanmoor's contention that the defendants had not met their burden of establishing that "the cartridges that were the subject of pre-critical date sales anticipated the claims of [his] patent."[61]  The court explained that (1) the defendants had conceded for summary judgment purposes that the accused cartridges infringed the patent; and (2) "[a]lthough [the defendants] bore the burden of proving that the cartridges that were the subject of the pre-critical date sales anticipated [Vanmoor's] patent, that burden was satisfied by Vanmoor's allegation that the accused cartridges infringe the [] patent."[62]

Here, plaintiffs' patent application was filed on July 17, 2000; therefore the critical date is July 17, 1999.  Plaintiffs accuse the AJXV shoe of literally infringing claims 5 and 6 of the '215 Patent, and defendants concede as much for the purposes of the instant motion.  Therefore, under *Vanmoor*, defendants have met their burden of proving that the AJXV anticipates the invention asserted in claims 5 and 6 of the '215 Patent.

---

[60]     *See id.* at 1365.

[61]     *Id.* at 1366.

[62]     *Id.*

16

Plaintiffs seek to avoid this result by arguing that defendants' Requests for Admission did not specify which *particular model* of the AJXV plaintiffs accused of infringing claims 5 and 6. According to plaintiffs, "[d]efendants have presented no evidence that every AJXV that Nike ever created always contained the same features, such that the [plaintiffs'] admission that one AJXV infringed is *per se* an admission that every single one infringed."[63]  Further, plaintiffs argue that "[d]efendants have put on no evidence whatsoever that this proves that the [image of the AJXV in the Request for Admission] is a true and accurate depiction of the same one they developed eleven years ago, and used for offers to sell prior to the one-sale bar date."[64]

Plaintiffs' pleadings and verified responses to Nike's Requests for Admission belie plaintiffs' argument, apparently concocted to avoid summary judgment.[65]  As explained above, the Complaint categorically alleges that the

---

[63]    Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion for Partial Summary Judgment ("Pl. Mem.") at 6.

[64]    *Id. Accord* Def. 56.1 Response ¶ 12 ("[Plaintiffs made th[e] admission based on a picture of the Air Jordan 15, and without the benefit of physically examine [sic] the Air Jordan 15 that was present in the Request for Admission. Furthermore, they do not know which version of the Air Jordan 15, or when the Air Jordan 15, depicted in the Request for Admission was manufactured or produced.").

[65]    Plaintiffs only recently adopted their present position.  In their October 21, 2009 letter to the Court, plaintiffs stated that early resolution of the

17

AJXV infringes the '215 Patent, and plaintiffs personally verified Rule 36 answers

that unequivocally admitted that they contend the AJXV literally infringes claims 5

and 6 of the '215 Patent. If plaintiffs wanted to accuse some AJXV shoes but not

others, they had a duty to qualify their responses appropriately.[66] They did not.

Further undermining plaintiffs' position is that they fail even now to identify a

particular model of the AJXV as the subject of their claims of infringement, despite

having had extensive discovery during the course of nearly a year.[67]

Plaintiffs also argue the they "never admitted what aspect of the

AJXV infringed and that is because Nike never asked that question. Defendants

assume that it is the portion of the AJXV called the 'outrigger,' but [plaintiffs]

never made that specific admission and they should not be held to defendants'

---

AJXV issue would avoid wasting resources because "if the AJXV is prior art then
it appears at this time that plaintiffs would have no claim for infringement against
all of the defendants' sneakers on the claim 5 issue." At that time, plaintiffs
already had the Humphrey Declaration and therefore knew about the various
models of the AJXV. Plaintiffs never suggested to the Court that they accuse only
some, but not other, AJXV shoes.

[66]     *See* Fed. R. Civ. P. 36(a)(4) ("[W]hen good faith requires that a party
qualify an answer or deny only a part of a matter, the answer must specify the part
admitted and qualify or deny the rest.").

[67]     *See, e.g., Anderson*, 477 U.S. at 257 ("[Non-movant] must present
affirmative evidence in order to defeat a properly supported motion for summary
judgment. This is true even where the evidence is likely to be within the
possession of the [movant], as long as the [non-movant] has had a full opportunity
to conduct discovery.").

characterization of what the [plaintiffs] meant."[68]  This argument is not only

insufficient to defeat summary judgment, it is a red herring.  Claims 5 and 6

describe a "lateral foot stabilizer" that is illustrated in Figures 1-3 of the '215

Patent, which are reproduced above.  Both the AJXV prototype (produced before

the critical date) and the first-run AJXV (produced based on pre-critical date

technical drawings and firmly ordered before the critical date) are illustrated above,

and both contain an outrigger.  These images demonstrate not only the undeniable

similarity between plaintiffs' lateral foot stabilizer and Nike's outrigger, but also

that Nike's outrigger is perhaps the only aspect of the AJXV that infringes claims 5

and 6 of plaintiffs' patent.  And like plaintiffs' failure to accuse any particular

model of AJXV, it is telling that plaintiffs do not identify any specific aspect of the

AJXV that they accuse of infringement.

Plaintiffs' citation to *ResQnet.com, Inc. v. Lansa, Inc.* is misplaced.[69]

There, the district court denied summary judgment under the on-sale bar because

the record did not clearly demonstrate that the product offered for sale before the

---

[68]     Pl. Mem. at 7.

[69]     *See* 382 F. Supp. 2d 424 (S.D.N.Y. 2005), *rev'd on other grounds*, 594 F.3d 860 (Fed. Cir. 2010).

critical date was materially identical to the accused product.[70]  Here, by contrast,

defendants have provided an abundance of evidence that the AJXV that was

offered for commercial sale and ready for patenting is the very same shoe plaintiffs

accuse of infringement.[71]

## C. The AJXV Was Offered for Commercial Sale Before the Critical Date

To trigger the statutory on-sale bar, the accused infringer must first

show that the product was subject to a commercial offer for sale before the critical

date.  Even "a single sale or offer for sale suffices to bar patentability."[72]

---

[70]    *See id.* at 438 ("Although certain similarities between the 1996 and accused versions of newlook are apparent based on a comparison of the documentary evidence submitted, the record does not clearly demonstrate that the newlook product offered for sale in 1996 is materially identical to the newlook product accused by ResQNet.  For instance, and notwithstanding the documentary evidence submitted by Lansa in a supplemental filing in September 2004, it is not evident whether the 1996 incarnation of newlook employed a server or communications channels in the same manner as the accused version of newlook, material features in view of the three computer host-server-terminal arrangement recited in the claim of the '075 Patent allegedly infringed by the present version of newlook.").

[71]    For example, Nike's evidence consistently refers to style code "136029" for the Men's AJXV.  *See, e.g.*, Humphrey Decl. ¶¶ 21-22 & Exs. D, E; Grove Decl. ¶¶ 12, 20 & Ex. B; Dix Haas Decl. Exs. A, B, C; Campbell Decl. ¶ 5 & Ex. A.  And though the design of the AJXV evolved, it was complete by May 1999 — before the critical date — and always contained an outrigger.

[72]    *Electromotive Div. of Gen. Motors Corp. v. Transportation Sys. Div. of Gen. Elec.*, 417 F.3d 1203, 1210 (Fed. Cir. 2005).  *Accord Atlantic Thermoplastics Co. v. Faytex Corp.*, 970 F.2d 834, 836 (Fed. Cir. 1992).

Acceptance of a purchase order for the patented invention constitutes a commercial sale for on-sale bar purposes.[73]

Defendants have provided clear and convincing evidence that the AJXV was offered for sale and commercially sold before the critical date — July 17, 1999. As detailed above, Nike sold eighteen pairs of AJXV shoes to showrooms and sales representatives in June 1999. Plaintiffs do not even attempt to dispute the evidence demonstrating these sales.[74] It is, therefore, uncontroverted that style code 136029 corresponds to the AJXV; that Orcutt's employment agreement obligated him to purchase the AJXV sample from his own funds; and that Nike's fiscal records show eighteen sales, including a sale from Nike, Inc. to Orcutt of style code 136029 in the year/month labeled 0001, which corresponds to June 1999.

---

[73]     See Pfaff, 525 U.S. at 67 ("In this case the acceptance of the purchase order prior to April 8, 1981, makes it clear that such an offer had been made, and there is no question that the sale was commercial rather than experimental in character."); Weatherchem Corp. v. J.L. Clark, Inc., 163 F.3d 1326, 1333 (Fed. Cir. 1998) ("Record evidence of a signed purchase agreement before the critical date establishes an offer for sale sufficient to invoke the on-sale bar."); Buildex Inc. v. Kason Indust., Inc., 849 F.2d 1461, 1464 (Fed. Cir. 1998) ("[T]he existence of a sales contract or the signing of a purchase agreement prior to [the critical] date has been held to demonstrate 'on-sale' status for the invention.").

[74]     It is puzzling that plaintiffs spend a great deal of space in their brief attacking the futures orders. See Pl. Mem. at 12-17. Defendants have not relied on the futures orders as a basis for application of the on-sale bar. Therefore, I do not address plaintiffs' arguments on this topic.

21

Nor do plaintiffs directly contravene defendants' evidence as to the pre-critical date purchase orders to non-Nike-owned factories in Taiwan for mass production of the AJXV shoe. Rather, plaintiffs' main challenge to this evidence is that it is provided through the declaration of Tanya Dix Haas. Specifically, plaintiffs request that the Court strike the Dix Haas declaration because defendants failed during discovery to identify Dix Haas as having relevant information about this case.[75] Plaintiffs argue that they have been "sandbagged" with new evidence, and prejudiced as a result.[76] Plaintiffs also argue that Dix Haas's declaration and the documents it authenticates are unreliable.[77]

However, as plaintiffs themselves observe, Dix Haas does not purport to have personal knowledge about the actual sales of the AJXV. Rather, her declaration simply authenticates and explains spreadsheets retrieved from a database containing certain product purchase orders and invoices kept in the ordinary course of business. Furthermore, Nike provided these data and

---

[75]    *See* Pl. Mem. at 17-18 (citing Fed. R. Civ. P. 37(c)(1), which provides: "If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless.").

[76]    *See id.* at 18.

[77]    *See id.* at 19.

documents to plaintiffs before the end of discovery.  Therefore, plaintiffs' claims

of sandbagging are unfounded, and I deny plaintiffs' request to strike the Dix Haas

declaration.

Because plaintiffs have not raised a genuine issue of material fact as

to whether the AJXV was subject to a commercial offer of sale, and because

defendants have provided clear and convincing evidence of such sales, the first

prong of the *Pfaff* analysis is satisfied.

### D.    The AJXV Was Ready for Patenting Before the Critical Date

The accused infringer must also show that the invention was ready for

patenting in order to invoke the on-sale bar.  "An invention can be found to be

'ready for patenting' in at least the following ways: by proof that it was reduced to

practice, or by proof that the inventor had prepared drawings or other descriptions

of the invention that were sufficiently specific to enable a person skilled in the art

to practice the invention."[78]

Nike argues that its design drawings, which were completed by May

1999, were sufficiently specific to enable a person skilled in the art to practice the

---

[78]    *Cargill, Inc. v. Canbra Foods, Ltd.*, 476 F.3d 1359, 1368 (Fed. Cir. 2007).  *Accord Pfaff*, 525 U.S. at 67-68.

invention.[79]  Plaintiffs counter that defendants failed to authenticate or lay the

proper foundation for these technical drawings, and failed to explain how these

drawings enable one skilled in the art to practice the invention.  Additionally,

plaintiffs contend that the outrigger was not ready for patenting because Nike

continued to refine the AJXV design.[80]

Plaintiffs' contentions are beside the point because the undisputed

evidence demonstrates that Nike reduced the AJXV to practice before the critical

date.  On May 20, 1999, Nike sent its manufacturers instructions and specifications

regarding production of the final version of the AJXV shoe.  This "tooling memo"

stated that "[t]his model is ready for commercialization."[81]  The factories were able

to mass produce AJXV shoes based on the information provided by Nike, as

evidenced by the fact that the shoes were actually produced, beginning in August

---

[79]     See Def. Mem. at 17 (citing Grove Decl. ¶ 18 & Ex. D (AJXV
technical drawings)).

[80]     Plaintiffs also ask rhetorically: "[I]f the outrigger was ready for
patenting, then why did Nike never patent it?"  Pl. Mem. at 21 (footnote omitted).
However, Nike points out that it "could not have patented the AJXV outrigger
because Nike has used outriggers on shoes since at least the mid-1980s and has
other patents on outriggers."  Defendants' Reply Memorandum of Law in Support
of Motion for Partial Summary Judgment at 6 n.6.  In any event, whether Nike
should or could have sought a patent for the outrigger is irrelevant to the inquiry
into whether the product was ready for patenting.

[81]     Ex. C to Grove Decl.

1999, based on the pre-critical date drawings.  Additionally, the factories produced various samples of the AJXV in early 1999, which further demonstrates that the outrigger was reduced to practice.[82]  Defendants have, therefore, provided clear and convincing evidence that the invention was ready for patenting, thereby satisfying the second prong of the *Pfaff* analysis.[83]

## V.   CONCLUSION

Defendants provided clear and convincing evidence that the AJXV fully anticipated the invention stated in claims 5 and 6 of the patent-in-suit, and was commercially offered and ready for patenting more than one year before plaintiffs applied for their patent.  Plaintiffs failed to show any disputed material fact.  Accordingly, defendants' motion for partial summary judgment is granted. The Clerk of Court is directed to close this motion (document # 69).  A conference is scheduled for June 9, 2010, at 4:00 p.m.

---

[82]     *Cf. Atlanta Attachment Co. v. Leggett & Platt, Inc.*, 516 F.3d 1361, 1367-68 (Fed. Cir. 2008) (invalidating claim under the on-sale bar based on non-final prototypes and noting "an invention can be considered reduced to practice even though it may be later refined or improved").

[83]     *See Pfaff*, 525 U.S. at 67-68 (invention ready for patenting where manufacturer was able to produce sockets containing all elements of the invention from detailed drawings provided); *Weatherchem Corp.*, 163 F.3d at 1334 (invention ready for patenting where a commercial quantity of the invention was ordered and the manufacturer was able to produce the invention using detailed drawings and specifications).

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:      May 24, 2010
            New York, New York

**- Appearances -**

**For Plaintiffs:**

Ira Scot Meyerowitz, Esq.
Jon Damon Jekielek, Esq.
Meyerowitz Jekielek, PLLC
295 Madison Avenue, 22nd Floor
New York, New York 10017
(212) 686-7008

**For Defendants Nike, Inc. and Converse Inc.:**

Milton Springut, Esq.
Tal S. Benschar, Esq.
Kalow & Springut LLP
488 Madison Avenue
New York, New York 10022
(212) 813-1600

B. Trent Webb, Esq.
Jonathan N. Zerger, Esq.
Angel Mitchell, Esq.
Shook, Hardy, & Bacon LLP
Kansas City, Missouri 64108
(816) 474-6550